**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 19 2013, 9:58 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:
**ROBERT D. MacGILL**
**CHRISTIAN P. JONES**
**MARK D. CRANDLEY**
Barnes & Thornburg LLP
Indianapolis, Indiana

Attorneys *pro hac vice*
**DAN J. HOFMEISTER, JR.**
**KEVIN D. TESSIER**
Reed Smith LLP
Chicago, Illinois

ATTORNEYS FOR APPELLEES:
Attorneys for Continental Casualty Company
**STEPHEN J. PETERS**
**DAVID I. RUBIN**
Harrison & Moberly, LLP
Indianapolis, Indiana

Attorneys *pro hac vice*
**MICHAEL M. MARICK**
**REBECCA R. HALLER**
Meckler Bulger Tilson Marick & Pearson LLP
Chicago, Illinois

Attorneys for Twin City Fire Ins. Co.
**JAMES W. RILEY, JR.**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

Attorneys *pro hac vice*
**JOHN E. BLACK, JR.**
**PETER F. LOVATO**
Boundas, Skarzynski, Walsh & Black, LLC
Chicago, Illinois

**MARK E. HADDAD**
**JONATHAN F. COHN**
Sidley & Austin
Chicago, Illinois

## IN THE
## COURT OF APPEALS OF INDIANA

_____

WELLPOINT, INC. (f/k/a ANTHEM, INC.) and )
ANTHEM INSURANCE COMPANIES, INC., )
)
    Appellants-Plaintiffs, )
)
        vs. )    No. 49A05-1202-PL-92

| | |
|---|---|
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, PA; AIG | ) |
| EUROPE (U.K.) LIMITED, NEW HAMPSHIRE | ) |
| INSURANCE COMPANY, CONTINENTAL | ) |
| CASUALTY COMPANY, ARROWOOD | ) |
| INDEMNITY COMPANY, TWIN CITY | ) |
| FIRE INSURANCE COMPANY, LIBERTY | ) |
| MUTUAL INSURANCE COMPANY (U.K.) | ) |
| LIMITED and CERTAIN UNDERWRITERS | ) |
| AT LLOYDS, | ) |
| | ) |
| Appellees-Defendants. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-0507-PL-26425

**June 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

Wellpoint sued a number of its insurers, including Continental Casualty Company and Twin City Fire Insurance Company ("the reinsurers"), who denied coverage for Wellpoint's defense and settlement of a number of lawsuits against it. Wellpoint raises six issues on appeal, of which we find one dispositive: whether Wellpoint's alleged wrongful acts occurred solely in its rendering of professional services in the form of claims handling and adjusting. As they did not, there was no coverage and summary judgment for the insurers was appropriate. We therefore affirm.

2

**FACTS AND PROCEDURAL HISTORY**

We set forth some of the facts underlying this litigation in *Wellpoint, Inc. v. Nat'l Union Fire Ins. Co.*, 952 N.E.2d 254, 256-58 (Ind. Ct. App. 2011), *reh'g denied*, *trans. denied*:[1]

> *A. Anthem's Reinsurance Arrangement*
>
> Anthem[2] set up a complex and multi-tiered arrangement to reinsure itself for error and omissions liability.[3] The arrangement involved (a) a primary insurance policy which Anthem issued to itself, (b) a certificate of reinsurance on the primary policy issued by National Union Fire Insurance Company, (c) four excess insurance policies which Anthem issued to itself and which followed form to the primary policy, thereby incorporating the primary policy's terms and conditions, and (d) numerous certificates of reinsurance on the excess policies issued by a bevy of additional reinsurers, in which the reinsurers agreed to assume the rights, powers, privileges, duties, and obligations as insurers under Anthem's policies. All policies/certificates were effective from September 30, 1999, until September 30, 2002.
>
> * * * * *
>
> *B. Anthem is Sued*
>
> In November 1999, Dr. Edward Collins and several other physicians filed a class action lawsuit in Connecticut state court against an Anthem subsidiary. The *Collins* plaintiffs alleged, among other things, that Anthem's subsidiary failed to timely and adequately reimburse for medical services. The plaintiffs set forth claims for breach of contract, conversion, tortious interference with business expectations, breach of good faith and fair dealing,

---

[1] In that decision we addressed whether certain policy provisions were intended to exclude coverage retrospectively based on claims preceding an insurer's relationship with the insured. No such issues have been raised in the case before us.

[2] Anthem and Wellpoint merged in 2004.

[3] "Errors and omissions" coverage is designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes, and errors inherent in the practice of the profession. *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 473 (Ind. Ct. App. 1996), *reh'g denied*, *trans. denied*. An errors and omissions insurer of a business does not have the duty to indemnify for the malicious and intentional, rather than careless and negligent, acts of the insured, even where the policy does not specifically exclude intentional acts. *Id*.

violation of the Connecticut Unfair Trade Practices Act, and violation of the Connecticut Unfair Insurance Practices Act.

Anthem reported *Collins* to National Union shortly after it was filed.

*C. Twin City Becomes One of Anthem's Excess Reinsurers*

Reliance Insurance Company went bankrupt before the end of the coverage period, so in July 2000 Anthem cancelled its policy with Reliance and obtained new excess coverage from Twin City.

Twin City's coverage certificate is missing, but various documents—including Twin City's business records, correspondence from Anthem's broker, and a binder issued by Twin City to Anthem - indicate that Twin City agreed to provide coverage under the same terms as Reliance for a policy period beginning July 15, 2000, and ending September 30, 2002.

*D. Anthem is Sued Some More*

Beginning in 2001, Anthem became subject to a series of over ten additional state and federal lawsuits alleging improper denial of reimbursement. Claims against Anthem were filed in February 2001, October 2001, April 2002, September 2002, May 2003, October 2003, November 2003, February 2004, and June 2004. Plaintiffs alleged in part that Anthem conspired with other managed-care organizations to deny, delay, and diminish payments to doctors. The suits set forth causes of action under the Racketeer Influence and Corrupt Organizations Act, claims for breach of contract, and violations of prompt-pay statutes. Many of the claims were consolidated into a multi-district litigation proceeding in United States District Court for the Southern District of Florida.

*E. Anthem Seeks Coverage from Its Reinsurers*

Anthem ultimately brought this action seeking, among other things, coverage from its reinsurers for four of the latter claims. Twin City counterclaimed seeking declaration that it owed no coverage for the specified claims as well as eight others.

Twin City later moved for summary judgment, arguing that because *Collins* arose before Twin City's policy period, and because the remaining post-2000 claims "related back" to *Collins,* Twin City owed no coverage obligation.

The trial court agreed and entered summary judgment in favor of Twin City. The court found that (a) the initial *Collins* claim was made and reported before Twin City's coverage period, (b) Twin City became an Anthem excess reinsurer following the cancellation of Reliance's policy, (c) the remaining post-2000 claims both "related" to *Collins* pursuant to policy Section 6 and were "interrelated" with *Collins* pursuant to Section 8, and (d) accordingly, Twin City's policy excluded any and all coverage obligations for the post-2000 claims.

4

(Footnotes added), *reh'g denied*, *trans. denied*.  We rejected Twin City's argument that the lawsuits "related back" to the *Collins* claim that preceded its policy period and, accordingly, reversed the summary judgment for Twin City and remanded.  *Id*. at 256.

In the case before us, Wellpoint sued Twin Cities, Continental, and other reinsurers seeking coverage for its settlement of the lawsuits against Wellpoint referenced above. Wellpoint claimed professional liability coverage under Part II of the policies, which provides in part that the policies will pay the "Loss of the Insured resulting from any Claim or Claims first made against the Insured . . . for any Wrongful Act of the Insured . . . but only if such Wrongful Act  . . . occurs solely in the rendering of or failure to render Professional Services."[4]  (App. at 3447.)  The trial court granted the reinsurers' motion[5] for summary judgment.

## DISCUSSION AND DECISION

Summary judgment is appropriate when the designated evidentiary matter shows there are no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law.  *Grinnell Mut. Reinsurance Co. v. Ault*, 918 N.E.2d 619, 624 (Ind. Ct. App. 2009).  When reviewing a summary judgment, we stand in the shoes of the trial court.  *Id*.

---

[4] As we find there was no coverage because the claims against Wellpoint did not arise out of acts that occurred "solely in the rendering of or failure to render professional services," we need not address the effect of the policy definitions of "Loss" or "Wrongful Act."

[5] Continental brought the motion for summary judgment.  The trial court granted Twin City's motion to be joined in the summary judgment order.  The parties do not direct us to anything in the record that indicates the status of the additional named defendants in that regard.

Once the moving party demonstrates, *prima facie*, that there are no genuine issues of material fact as to any determinative issue, the burden is on the non-moving party to come forward with contrary evidence. *Id*. The non-moving party may not rest on the pleadings but must instead set forth specific facts, using supporting materials contemplated under Trial Rule 56, which show there is a genuine issue for trial. *Id*.

The party appealing a summary judgment bears the burden of persuading this court that the trial court erred, but we still carefully scrutinize the entry of summary judgment to ensure that the non-prevailing party was not denied its day in court. *Id*. We do not weigh the evidence but rather consider the facts in the light most favorable to the nonmoving party. We may sustain the judgment upon any theory supported by the designated evidence. *Id*. The trial court here entered specific findings of fact and conclusions thereon. Although such findings and conclusions facilitate appellate review by offering insight into the trial court's reasons for granting summary judgment, they do not alter our standard of review and are not binding on this court. *Id*. at 625.

Insurance contracts are governed by the same rules of construction as other contracts, and the proper interpretation of an insurance policy, even if it is ambiguous, is generally a question of law appropriate for summary judgment. *Wellpoint*, 952 N.E.2d at 258. If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Id*. An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. *Id*. An insurance policy is ambiguous if reasonable people may honestly differ as to the meaning of the policy language. *Id.*

6

When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the contract. *Id.* We construe the policy as a whole and consider all of its provisions and not just the individual words, phrases, or paragraphs. *Id.* When insurance policies are interpreted, exceptions, limitations, and exclusions to coverage must be plainly expressed. *Id.* at 258-59.

The Anthem policy covers claims against the insured for a wrongful act "only if such Wrongful Act . . . occurs solely in the rendering of or failure to render Professional Services." (App. at 852.) "Professional Services" are "services rendered or required to be rendered solely in the conduct of the Insured's claims handling or adjusting." (*Id.*) Therefore, coverage is available only if the alleged wrongful acts that gave rise to the underlying litigation happened solely in the conduct of Anthem's claims handling and adjusting. They did not.

The underlying lawsuits primarily involved violations under two statutes. Some of the plaintiffs set forth claims for breach of contract, conversion, tortious interference with business expectations, breach of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act (CUTPA).[6] Other plaintiffs alleged in part that Anthem conspired with other managed-care organizations to deny, delay, and diminish payments to doctors and set forth causes of action under the Racketeer Influence and Corrupt Organizations Act

---

[6] Conn. Gen. Stat. § 42-110a *et seq.*

7

("RICO").[7] The RICO plaintiffs also asserted other claims including breach of contract and violations of prompt-pay statutes.

The trial court correctly determined the underlying "settled claims were not for 'wrongful acts' occurring solely in the rendering of or failure to render 'professional services,'" (App. at 49), *i.e.*, "services rendered or required to be rendered solely in the conduct of the Insured's claims handling or adjusting." (*Id*. at 3447.) The policies therefore did not provide coverage for Anthem, and summary judgment for Continental and Twin Cities was not error.

As the wrongful acts alleged in the underlying complaints were not professional services in the form of claims handling or adjusting, we agree the policies at issue did not provide coverage for Wellpoint. The trial court noted the "underlying complaints do not simply allege that [Wellpoint] improperly denied claims. Rather, they allege [Wellpoint] participated in 'a common scheme' to 'systematically deny, delay, and diminish the payments due to doctors.'" (App. at 52.) It found "the conduct that was central to the RICO claims was [Wellpoint's] *unlawful agreement* with other managed care companies to unlawfully reduce payments to Providers," and such unlawful agreements and conspiracies are not claim handling activities. (*Id.*)

Where "the gravamen of the arbitration demand was the breach of the exclusivity provision" in the form of improper diversion of business, breach of its exclusivity obligation was not within coverage for wrongful acts "committed in the conduct of the insured's

---

[7] 18 U.S.C. § 1962.

business . . . in rendering or failing to render professional services." *Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 489 F.3d 71, 73 (1st Cir. 2007). That court noted the Supreme Court of Nebraska's description of "professional services":

> Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. . . . A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill.

*Id*. at 73-74 (quoting *Marx v. Hartford Accident & Indem. Co.*, 157 N.W.2d 870, 871-72 (Neb. 1968)). In *Massamont*, the decision to divert business "may have been caused by friction over insurance matters but it was a distinct business decision by Massamont as to whether to maintain a relationship with a particular insurer . . . . Such a decision is not the provision of professional services" in an errors and omissions policy. *Id*. at 74. Such acts may

> set the stage for the performance of business or professional services, [but] they are not the professional services contemplated by this special coverage. An errors and omissions policy is intended to insure a member of a designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business.

*Id.* (quoting *Albert J. Schiff Assocs., Inc. v. Flack,* 417 N.E.2d 84, 88 (N.Y. 1980). As the allegations against Wellpoint did not involve such "mistakes inherent in the practice of that particular profession or business," they were not "professional services" covered by the Continental and Twin City policies.

Wellpoint relies on *Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.*, 2011 WL 4543896 (S.D. Ohio Sept. 29, 2011), *modified,* 2011 WL 6371901 (S.D. Ohio Dec. 20,

9

2011). *Chubb* is factually distinguishable. There, the policy defined "Wrongful Act" as any error, misstatement, misleading statement, act, omission, neglect or breach of duty by Grange that "arises solely from . . . performing **Insurance Services** or **Financial Services."** *Id*. at *2. Under the Policy, Chubb generally agreed to indemnify Grange for losses arising from Grange's performance of claims handling and adjusting. The parties disputed whether the Policy provided coverage for Grange in connection with two class action lawsuits against Grange by its own insureds.

Both alleged improper use of software "*in the claims process*." *Id*. at *4 (emphasis added). The "gravamen" of both suits was that Grange was "improperly using software to evaluate and underpay what their insureds were entitled to recover as general damages for bodily injury sustained due to the conduct of an operator of an uninsured or underinsured motor vehicle." *Id*.

Chubb argued the alleged wrongful conduct committed by Grange did not arise "solely" from Grange performing insurance services because Grange made its decision to purchase and implement the software before it used the software, and because Grange entered a confidentiality agreement with the software provider before it was used:

> But the gravamen of the lawsuits against Grange was that it improperly used the software in order to underpay the plaintiffs for general damages on bodily injury claims. The alleged wrongful conduct that proximately impacted the plaintiffs was the use of the software in the adjusting of their claims, not the business decision to purchase the software. That the determination by Grange to implement the use of the software predated its use, does not place the alleged wrongful conduct beyond the scope of the Policy.

*Id*. at *10.

10

In the case before us, by contrast, the gravamen of the claims against Wellpoint was, as the trial court correctly noted, allegations Wellpoint participated in a common scheme to systematically deny, delay, and diminish the payments due to doctors, and "the conduct that was central to the RICO claims was [Wellpoint's] ***unlawful agreement*** with other managed care companies to unlawfully reduce payments to Providers," and such unlawful agreements and conspiracies are not professional services in the form of claim handling activities. (App. at 52.)

Even if some professional services were implicated, the underlying actions did not arise "solely" out of Wellpoint's rendering or failure to render such services. After determining the alleged conspiracies and unlawful agreements were not "professional services," the trial court found they "plainly did not occur solely in the performance of claims handling." (*Id*. at 53.) Specifically, it noted allegations of conduct in furtherance of the RICO conspiracies including Wellpoint's involvement in trade associations that develop industry standards and in industry groups that disseminate unified information and exchange upper-level employees in order to facilitate unified action, and its participation in a managed care enterprise.

We believe the policy language is not ambiguous, and that "solely" means solely. The term "solely" implies "exclusively" or "entirely." *Vill. of Hoffman Estates v. Cincinnati Ins. Co.*, 670 N.E.2d 874, 875 (Ill. App. Ct. 1996), *appeal denied* 168 Ill.2d 591 (1996). There, Cincinnati Insurance Company issued a policy with an endorsement that added the Village as

11

an additional insured, "but only with respect to liability incurred solely as a result of some act or omission of the NAMED INSURED." *Id.*

That court held the endorsement was "plain and unambiguous." *Id.* The endorsement specifically stated the Village was covered only if its liability was predicated *solely* on the acts or omissions of the named insured, so the insured's "acts or omissions *must be the sole ground for alleging liability* against the Village for coverage to apply." *Id.* (Emphasis added.) The underlying complaint was against both the insured and the Village, and each allegation in each count was jointly and severally directed against "the defendants, and each of them." *Id.* Therefore, the underlying complaint is not "based *solely* on the acts of [the named insured]. . . . Thus, the explicit terms of the endorsement are not met, and [the Village] is not covered." *Id.* Nor were Wellpoint's claims handling practices the sole ground for the allegations against Wellpoint in the underlying actions.

Wellpoint argues that even if some wrongful acts did not occur solely in the performance of claims handling, coverage is not negated for other wrongful acts that did occur in the performance of claims handling. That argument is inconsistent with the meaning of "solely" as "exclusively" or "entirely," *Vill. of Hoffman Estates,* 670 N.E.2d at 875, and a similar argument was rejected in *Discover Fin. Services LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 527 F. Supp. 2d 806, 820 (N.D. Ill. 2007). That court "adhere[d] to the established principle that, in the absence of ambiguity, the court must give the words of an insurance policy their plain and ordinary meaning." *Id.* It found a requirement that a covered advertising injury be an "injury arising solely out of . . . advertising activities" was not

12

ambiguous and "simply requires that, to the extent Discover is alleged to have caused [the plaintiff who sued Discover for patent infringement] an advertising injury, Discover's advertising activities must have been the sole cause of that injury." *Id*. The court found the allegations did not attribute the plaintiff's injuries solely to Discover's advertising activities, as the plaintiff accused Discover of "making, using, offering to sell, and/or selling automated telephone systems. . . . These allegations bear no apparent connection to advertising activities." *Id*. In the case before us, Wellpoint does not, and cannot, claim all the injuries it is alleged to have caused arose solely out of claims handling activities.

In *Nations First Mortg., LLC v. Tudor Ins. Co.*, 2009 WL 3182967 at *2 (M.D. Pa. Sept. 30, 2009), a policy applied to "actual or alleged negligent acts, errors or omissions arising solely out of professional services rendered" but did not apply to any loss in connection with any "dishonest, fraudulent, criminal or malicious act or omission of the Insured." Nations First agreed the underlying complaint "is basically about fraud and taking advantage of people," but argued covered errors and omissions were also alleged in the complaint. *Id*. at *11. The court found it did not provide coverage for losses attributable to fraudulent conduct.

As the allegations against Wellpoint did not arise "solely," *i.e.*, exclusively or entirely, out of its claims handling activities, the reinsurers' policies did not provide coverage. We accordingly affirm.

13

Affirmed.

PYLE, J., concurs.

ROBB, C.J., dissenting with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

WELLPOINT, INC, (f/k/a ANTHEM, INC.) and )
ANTHEM INSURANCE COMPANIES, INC., )
)
Appellants-Plaintiffs, )
)
vs. )   No. 49A05-1202-PL-92
)
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA; AIG )
EUROPE (U.K.) LIMITE, NEW HAMPSHIRE )
INSURANCE COMPANY, CONTINENTAL )
CASUALTY COMPANY, ARROWOOD )
INDEMNITY COMPANY, TWIN CITY FIRE )
INSURANCE COMPANY, LIBERTY )
MUTUAL INSURANCE COMPANY (U.K.) )
LIMITED and CERTAIN UNDERWRITERS )
AT LLOYDS, )
)
Appellees-Defendants. )

**ROBB, Chief Judge, dissenting**

I respectfully dissent from the majority's conclusion that summary judgment for the

reinsurers was appropriate because Wellpoint's alleged wrongful acts did not occur solely in

the conduct of Wellpoint's claims handling and adjusting activities and were therefore not

covered by the professional liability policies. I believe the majority interprets the coverage

provision too narrowly and that there is a question of fact as to whether Wellpoint's acts were

15

done solely in the rendering of or failure to render professional services; accordingly, I would reverse the trial court's grant of summary judgment and remand for further proceedings.

The professional liability policies at issue provide that they shall cover Wellpoint's loss for any wrongful act by Wellpoint "only if such Wrongful Act . . . occurs solely in the rendering of or failure to render Professional Services." See slip op. at 7 (quoting App. at 852). "Professional Services" are defined as "services rendered or required to be rendered solely in the conduct of the Insured's claims handling and adjusting . . . ." Id. Wellpoint sought coverage under these policies for its settlement of lawsuits filed by providers of health care services to Wellpoint's subscribers claiming improper reimbursement for medical services. The trial court granted summary judgment to the reinsurers and the majority holds the trial court was correct in doing so because Wellpoint's actions giving rise to the claims were not done solely in its claims handling and adjusting practices.

Because the policies provide coverage for the rendering or failure to render its professional services, I believe it is inappropriate at the summary judgment stage to determine that Wellpoint's actions are not covered under the policies as a matter of law. The policies cover not just Wellpoint's actions in paying reimbursements to health care providers, but also its actions in failing to pay reimbursements. The subject lawsuits challenged the manner in which Wellpoint did just that, and as adjusting and paying claims from health care providers is one of the professional services for which it was insured, I believe the majority opinion interprets the language of the policies, and specifically the use of the word "solely" in the coverage provision, too narrowly at this stage of the proceedings. It may be true that

16

the individual activities Wellpoint is alleged to have engaged in are not covered due to other provisions of the policy, but Wellpoint's actions also may well fall within the "failure to render" provision, and I would not say on summary judgment that the activities did not arise solely out of Wellpoint's provision of professional services because it is not appropriate at this stage to evaluate and weigh the conduct for ourselves. I would reverse the trial court's grant of summary judgment.